# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID FLOOD, ADMINISTRATOR** | : | **Civil No. 1:15-CV-890** |
| **EXECUTIVE DIRECTOR THE** | : | |
| **NITTANY LIGER COLLEGIATE** | : | |
| **ATHLETES' CORPS. & NATIONAL** | : | |
| **SCOUTING AEGIS LLC** | : | |
| | : | |
| **Plaintiff** | : | **(Judge Caldwell)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **NATIONAL COLLEGIATE ATHLETIC** | : | |
| **ASSOCIATION, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

### I.   Statement of facts and of The Case

This *pro se* complaint comes before us for consideration of two motions:  a motion to dismiss filed by the defendants, National Collegiate Athletic Association (NCAA), and its officers, (Doc.11.), and a self-styled "motion for next friend standing," (Doc. 22.), filed by the *pro se* plaintiff, David Flood.

Mr. Flood is a deeply committed fan of Penn State Football, whose commitment to the Nittany Lions has inspired him to found the Nittany Liger, a business entity which specializes in scouting and recruiting exceptionally talented blue chip high school and junior college student-athletes to be considered for scholarships at Penn

State. (Doc. 1.) Flood's commitment to Penn State football has also inspired him to bring this federal lawsuit against the NCAA, its general counsel and its President. (Id.)

The gravamen of Flood's complaint relates to a July 2012 consent decree entered into by the University and the NCAA in the wake of the Jerry Sandusky child sexual abuse scandal, a consent decree which imposed a series of NCAA sanctions upon the Penn State football program. (Id.) Asserting standing on behalf of the Penn State athletes affected by this consent decree, Flood purports to bring this lawsuit in federal court alleging some 11 causes of action including criminal uttering of false documents, civil rights violations, Title IX discrimination, negligent and intentional infliction of emotional distress, fraud, "breach of duty", and "negotiating in bad faith." (Id.)

Because Flood paid the filing fee prescribed by law, this *pro se* complaint was not subject to threshold legal screening but was served upon the defendants. The defendant NCAA and its counsel and President have now filed a motion to dismiss this complaint, arguing both that Flood lacks standing to bring these third party claims, and that many of Flood's individual claims fail on their merits. (Doc 11.) Flood, in turn, has responded to this motion by seeking a judicial declaration that he may assert what he calls next friend third party standing. (Doc. 22.) Flood supports this claim of third

party standing with factual averments that speak to his love of Penn State football, and reflect familiar themes of a middle-aged man's wistful recollection of his youthful vigor,[1] but add little to our understanding of this important legal question, stating:

> The plaintiff believes he meets "next friend" standing for two inherent reasons: 1.) He grew up in Harrisburg, Pennsylvania loving and playing the game of football since the age of 9 with other members of a team; and by the end of his senior season (1980) at Susquehanna Twp. High school he was selected as a second team Capital Area Conference All-Star linebacker pick by the Patriot News . . .; and 2.) If it were not for his parents being Penn State University alumni, the plaintiff would never have attended a live Penn States football game in 1977, which afterwards, fed their passions and dreams of one day playing for the Nittany Lions.
>
> (Doc. 23, p.3.)

On the basis of this novel assertion of standing, Flood seeks leave of court to maintain these claims against the NCAA on behalf of Penn State athletes. Having carefully considered the arguments of the parties, for the reasons set forth below, it is recommended that the NCAA's motion to dismiss be granted, and Flood's motion for a declaration of next friend standing be denied.

---

[1]See Bruce Springsteen, Glory Days, ("Glory days well they'll pass you by Glory days in the wink of a young girl's eye . Glory days, glory days.")

## II.    Discussion

### A.    Motion to Dismiss, Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a complaint should be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years.  Beginning with the Supreme Court's opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) continuing with our opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008)] and culminating recently with the Supreme Court's decision in Ashcroft v. Iqbal –U.S.–, 129 S.Ct. 1937 (2009) pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff.  Jordan v. Fox Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994).  However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower

Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Rather, in conducting a review of the adequacy of complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 679.

Thus, following Twombly and Iqbal a well-pleaded complaint must contain more than mere legal labels and conclusions.  Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation.  As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis.  First, the factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the court of appeals has observed:  "The Supreme Court in Twombly set forth the 'plausibility' standard for overcoming a motion to dismiss and refined this approach in Iqbal.  The plausibility standard requires the complaint to allege 'enough facts to state a claim to relief that is plausible on its face.'  Twombly, 550 U.S. at 570, 127 S.Ct. 1955.  A complaint satisfies the plausibility standard when the factual pleadings 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'  Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955).  This standard requires showing 'more than a sheer possibility

that a defendant has acted unlawfully.' Id. A complaint which pleads facts 'merely consistent with' a defendant's liability, [ ] 'stops short of the line between possibility and plausibility of "entitlement of relief." ' " Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011) cert. denied, 132 S. Ct. 1861, 182 L. Ed. 2d 644 (U.S. 2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Iqbal, 129 S.Ct. at 1947. Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Id. at 1950. Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' Id." Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010).

In undertaking this task, the court generally relies only on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are

not physically attached to the pleading, may be considered." <u>Pryor v. Nat'l Collegiate Athletic Ass'n</u>, 288 F.3d 548, 560 (3d Cir. 2002); <u>see also</u>, <u>U.S. Express Lines, Ltd. v. Higgins</u>, 281 F.3d 382, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment.")  However, the court may not rely on other parts of the record.

Applying these legal guideposts, for the reasons set forth below, it is recommended that the NCAA's motion to dismiss be granted, and Flood's motion for next friend standing be denied.

### B.  Flood Lacks Standing To Bring Third Party Claims On Behalf of Penn State Athletes

At the outset, it appears that Flood lacks standing to bring this action to the extent that he purports to sue the NCAA on behalf of Penn State athletes.  "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance.  This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'  <u>Warth v. Seldin</u>, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)."  <u>Kowalski v. Tesmer</u>, 543 U.S. 125, 128 29, 125 S. Ct. 564, 567, 160 L. Ed. 2d 519 (2004).  Standing is a essential prerequisite to filing an action in federal court.  As we have explained:

A party invoking federal jurisdiction must establish that he has standing to sue within the meaning of Article III, Section Two of the Constitution, which limits the courts to hearing actual cases or controversies." Anjelino v. New York Times, 200 F.3d 73, 88 (3d Cir.1999). "[T]he irreducible constitutional minimum" of standing requires a party to set forth specific facts indicating the existence of an actual or imminent injury that is causally connected to the defendant's challenged action and is " 'likely' " to be " 'redressed by a favorable decision.' " Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting Simon v. En. Ky. Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). "Courts assess whether a party has established injury-in-fact, causation, and redressability by considering whether the alleged injury falls within the 'zone of interests' that the statute or constitutional provision at issue was designed to protect; whether the complaint raises concrete questions, rather than abstract ones that are better suited to resolution by the legislative and executive branches; and whether the plaintiff is asserting his own legal rights and interests, as opposed to those of third parties." Anjelino, 200 F.3d at 88.

Montone v. City of Jersey City, 709 F.3d 181, 196 (3d Cir. 2013).

In the instant case, Flood's complaint relies largely upon a particular form of standing, known as third party standing, since Flood–who is not a Penn State athlete–seeks to litigate claims on behalf of Penn State athletes. Such assertions of third party standing are strongly disfavored by the courts. As the Supreme Court has explained:

We have adhered to the rule that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, supra, at 499, 95 S.Ct. 2197. This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation. See 422 U.S., at 500, 95 S.Ct. 2197. It represents a "healthy concern that if

the claim is brought by someone other than one at whom the constitutional protection is aimed," <u>Secretary of State of Md. v. Joseph H. Munson Co.</u>, 467 U.S. 947, 955, n. 5, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), the courts might be "called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights," <u>Warth v. Seldin, supra</u>, at 500, 95 S.Ct. 2197. We have not treated this rule as absolute, however, recognizing that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another. But we have limited this exception by requiring that a party seeking third-party standing make two additional showings. First, we have asked whether the party asserting the right has a "close" relationship with the person who possesses the right. <u>Powers v. Ohio</u>, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Second, we have considered whether there is a "hindrance" to the possessor's ability to protect his own interests. <u>Ibid</u>.

<u>Kowalski v. Tesmer</u>, 543 U.S. 125, 129-30, 125 S. Ct. 564, 567-68, 160 L. Ed. 2d 519 (2004).

Judged against these constitutional and prudential benchmarks for standing, we submit that Flood lacks standing to assert third party claims on behalf of Penn State athletes. While we do not in any way denigrate or diminish the passion of Flood's commitment to Penn State football, in our view the passions of even the most passionate of sports fans do not qualify as the type of "close" relationship which supports third party standing. <u>See</u> <u>Mayer v. Belichick</u>, 605 F.3d 223, 237 (3d Cir. 2010)(New York Jets fan suffered no legally cognizable injury from the New England Patriots' surreptitious videotaping of Jets' game signals). Moreover, there is no indication that Penn States athletes suffer an hindrance which wholly prevents them

from litigating claims on their own behalf. Quite the contrary, as the NCAA aptly notes Penn State athletes have brought legal claims in the wake of this consent decree, and historically Penn State students have displayed both a willingness and an ability to bring their own claims in federal court. See Benner v. Oswald, 444 F. Supp. 545 (M.D. Pa. 1978) aff'd, 592 F.2d 174 (3d Cir. 1979).

Finally, Flood' status as a *pro se* litigant presents a further impediment to this assertion of third party standing since *pro se* parties are traditionally barred from asserting claims on behalf of others. For example, "a prisoner proceeding *pro se* may not seek relief on behalf of his fellow inmates. See Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir.1975) ("[I]t is plain error to permit [an] imprisoned litigant who is unassisted by counsel to represent his fellow inmates in a class action."); see also Wallace v. Smith, 145 Fed. Appx. 300, 302 (11th Cir.2005)." Alexander v. New Jersey State Parole Bd,. 160 F.App'x 249, 250 (3d Cir. 2005). Thus, "*pro se* litigants are generally not appropriate as class representatives. See Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir.1975)." Hagan v. Rogers, 570 F.3d 146, 159 (3d Cir. 2009).

In sum, Flood has failed to demonstrate a valid claim to third party standing in this case. Therefore, his motion for a declaration of next friend standing should be denied, and Flood's claims that are premised on third party standing should be dismissed.

## C. The Remaining Counts of Flood's Complaint Fail to State Claims Upon Which Relief May Be Granted

Beyond this threshold constitutional and prudential obstacle to pursuing this lawsuit arising from Flood's inability to assert third party standing, the specific claims advanced by Flood fail on numerous, independent legal grounds. The legal flaws in these separate claims are discussed separately below:

### 1. Flood May Not Bring Criminal Claims in This Civil Lawsuit

At the outset, in his complaint Flood appears to rely upon what he describes as a federal criminal statute prohibiting uttering and publishing false instruments with the intent to defraud to bring a claim against the NCAA and its officers. The short answer to this contention is that it is well established that decisions regarding the enforcement of criminal laws are the prerogative of the executive branch of government, are consigned to the sound discretion of prosecutors, and under the separation of powers doctrine are not subject to judicial fiat. Indeed, it has long been recognized that the exercise of prosecutorial discretion is a matter, "particularly ill-suited to judicial review." Wayte v. United States, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Recognizing this fact, courts have long held that plaintiffs may not seek relief against third parties in civil litigation through some exclusively criminal statute, finding that civil plaintiffs lack standing to make such claims and concluding that such

relief simply is unavailable in a civil lawsuit. See, e.g., Ostrowski v. Mehltretter, 20 Fed. Appx. 87, 90 (2d Cir.2001) (stating that "Ostrowski has no standing to sue for any of Mehltretter's actions. First of all, he has not shown, injury-in-fact. The failure of Mehltretter to investigate or prosecute Bybel did not injure him in any direct manner-he has no 'personal stake in the outcome' of a perjury case brought against (or not brought against) another person ."); See also Kim v. Romero, 877 F.2d 64, 1989 WL 67116 at *1 (9th Cir. June 14, 1989) (affirming the dismissal of a suit against various prosecuting authorities for their failure to bring charges against a sheriff for alleged battery); McMinn v. Damiani, 765 F.2d 145, 1985 WL 13323 (6th Cir. May 3, 1985) (affirming the dismissal for lack of standing a pro se civil rights case where plaintiff had sued state prosecuting authorities for failing to investigate or prosecute claims against various state judges and lawyers); Gessner v. Dep't of Corr., 3:14-CV-111, 2014 WL 972290 (M.D. Pa. Mar. 12, 2014); Snyder v. Aaron, CIV.A. 05–1602, 2006 WL 544466 (W.D.Pa. Mar.6, 2006); Mover v. Borough of North Wales, Civ. No. 00–1092, 2000 WL 1665132 at *2 (E.D.Pa.Nov.7, 2000) (stating that "Moyer has no judicially cognizable interest in Timothy Conley's criminal prosecution. Accordingly, an agreement to refrain from prosecuting Conley for sexual assault or to charge him with disorderly conduct or the act thereof violates no constitutional right that Moyer has standing to assert."); see also Wise v. Augustine, Civ. No. 97–2651, 1997 WL

534695 at *2 (E.D.Pa. Aug.8, 1997) (stating that "[a] private citizen has no constitutional, statutory, or common law right to require a public official to investigate or prosecute a crime."); Dundore v. O'Donnell, Civ. No. 85–2907, 1985 WL 2681 at *2 (E.D.Pa. Sept.17, 1985) (stating that "Defendant O'Donnell is alleged to have refused to file the criminal charges brought by plaintiffs. Although plaintiffs were no doubt aggrieved when O'Donnell refused to file the charges, they have no constitutional right that I am aware of to have criminal charges filed."); Corbin v. Stevens, Civ. No. 91–1054, 1992 WL 96684 at *2 (S.D.N.Y. April 30, 1992) (stating that "[p]laintiff possesses no constitutional right to have someone arrested...."). Therefore, this claim fails as a matter of law and should be dismissed.

## 2. Flood's Claims Are Time-Barred

In addition, many of Flood's claims are time-barred. Flood's lawsuit challenges a July 2012 consent decree entered into between Penn State University and the NCAA. Flood first brought this claim in May of 2015, almost three years later, alleging state law torts and civil rights violations under Title IX as well as 42 U.S.C. §§1983 and 1985(3). It is well-settled that claims brought pursuant to 42 U.S.C. §§ 1983 and 1985(3) are subject to the state statute of limitations for personal injury actions; Wilson v. Garcia, 471 U.S. 261, 266-67 (1985), which in Pennsylvania is a two year limitations period. Lake v. Arnold, 232 F.3d 360, 368-69 (3d Cir. 2000) (applying

Pennsylvania's two-year personal injury statute of limitations to claims under 42 U.S.C. §§ 1983and 1985(3)).  In Pennsylvania, the statute of limitations for tort actions, like the state law torts asserted here by Flood,  is also generally two years, or less.  42 Pa.C.S.A. § 5524.  See Aquilino v. Phila. Catholic Archdiocese, 2004 PA Super 339, ¶ 8, 884 A.2d 1269, 1275 (2005) (applying two-year limitations period set forth in 42 Pa. C.S. § 5524 to claims for intentional and negligent infliction of emotional distress); Maillie v. Greater Del. Valley Health Care, Inc., 156 Pa. Commw. 582, 590, 628 A.2d 528, 532 (1993) (stating that 42 Pa. C.S. § 5524(7) "provides a two-year statute of limitations for commencing proceedings based upon alleged fraud, which includes breach of a fiduciary duty"); see also 42 Pa. C.S. § 5523; Dellape v. Murray, 651 A.2d 638, 640 (Pa. Commw. Ct. 1994) ("The statute of limitations for a defamation cause of action is one year" (citing 42 Pa. C.S. § 5523)).  Further, a claim under Title IX is deemed to be subject to a two-year statute of limitations.  Bougher v. Univ. of Pittsburgh, 882 F.2d 74, 77-78 (3d Cir. 1989)(applying Pennsylvania's two-year personal injury statute of limitations to claims under Title IX).

A cause of action accrues for statute of limitations purposes when the plaintiff knows or has reason to know of the injury that constitutes the basis of the cause of action. Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998); see also, Nelson v. County of Allegheny, 60 F.3d 1010 (3d Cir. 1995).

While this two-year limitations period may be extended based upon a continuing wrong theory, a plaintiff must make an exacting showing to avail himself of this grounds for tolling the statute of limitations. For example, it is well settled that the "continuing conduct of [a] defendant will not stop the ticking of the limitations clock [once] plaintiff obtained requisite information [to state a cause of action]. On discovering an injury and its cause, a claimant must choose to sue or forego that remedy." Barnes v. American Tobacco Co., 161 F.3d 127, 154 (3d Cir. 1998) (quoting Kichline v. Consolidated Rail Corp., 800 F. 2d 356, 360 (3d Cir. 1986)). See also Lake v. Arnold, 232 F.3d 360, 266-68 (3d Cir. 2000). Instead:

> The continuing violations doctrine is an "equitable exception to the timely filing requirement." West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir.1995). Thus, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1295 (3d Cir.1991).In order to benefit from the doctrine, a plaintiff must establish that the defendant's conduct is "more than the occurrence of isolated or sporadic acts." West, 45 F.3d at 755 (quotation omitted). Regarding this inquiry, we have recognized that courts should consider at least three factors: (1) subject matter-whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency-whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence-whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. See id. at 755 n. 9 (citing Berry v. Board of Supervisors of Louisiana State

<u>Univ.</u>, 715 F.2d 971, 981 (5th Cir.1983)).  The consideration of "degree
of permanence" is the most important of the factors.  <u>See</u> <u>Berry</u>, 715 F.2d
at 981.

<u>Cowell v. Palmer Township</u>. 263 F.3d 286, 292 (3d Cir. 2001).

Judged against these guideposts, Flood's claims–all of which were made
approximately 33 months after the execution of this consent agreement–are barred by
the statute of limitations.  Indeed, in his response to the NCAA's motion to dismiss,
Flood does not even seriously dispute this point.  Nor can Flood save these otherwise
time-barred claims by reference to some continuing violation theory.  Given the
gravity which Flood attaches to the execution of this agreement, it is evident that this
event had, for Flood, a degree of permanence which should have placed Flood on
immediate notice of the necessity for legal action on his part.  Flood's failure to act
over a 33 month period, therefore, cannot be excused and these claims fall beyond the
statute of limitations.

### 3.    Flood's Title IX,  Section 1983 and Section 1985(3) Claims Also Fail as a Matter of Law

Likewise, Flood may not rely upon 42 U.S.C. §1983, the general federal civil
rights statute, to bring a claim against the NCAA and its officers, all of whom are
non-governmental actors.  It is well-established that § 1983 does not by its own force
create new and independent legal rights to damages in civil rights actions.  Rather, §
1983 simply serves as a vehicle for private parties to bring civil actions to vindicate

violations of separate, and pre-existing, legal rights otherwise guaranteed under the Constitution and laws of the United States. Albright v. Oliver, 510 U.S. 266, 271 (1994); Graham v. Connor, 490 U.S. 386, 393-94 (1989). Therefore, any analysis of the legal sufficiency of a cause of action under § 1983 must begin with an assessment of the validity of the underlying constitutional and statutory claims advanced by the plaintiff.

In this regard, it is also well-settled that:

Section 1983 provides a remedy for deprivations of federally protected rights caused by persons acting under color of state law. The two essential elements of a § 1983 action are: *(1) whether the conduct complained of was committed by a person acting under color of state law*; and (2) whether this conduct deprived a person of a federally protected right. Parratt v. Taylor, 451 U.S. 527, 535 (1981).

Boykin v. Bloomsburg University of Pennsylvania, 893 F.Supp. 409, 416 (M.D.Pa. 1995), aff'd, 91 F3d 122 (3d Cir. 1996)(emphasis added). Thus, it is essential to any civil rights claim brought under § 1983 that the plaintiff allege and prove that the defendant was acting under color of law when that defendant allegedly violated the plaintiff's rights. To the extent that a complaint seeks to hold private parties liable for alleged civil rights violations, it fails to state a valid cause of action under 42 U.S.C. § 1983 since the statute typically requires a showing that the defendants are state actors. Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

This basic legal tenet is fatal to Flood's §1983 claims. Without diminishing in any way the significance of collegiate athletics to our popular culture, we are constrained to note that the United States Supreme Court has held that the NCAA is not a state actor for purposes of liability under §1983. Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 199, 109 S. Ct. 454, 465, 102 L. Ed. 2d 469 (1988). Therefore, NCAA disciplinary proceedings simply do not create civil rights liability under this statute.

Nor can Flood maintain a claim under 42 U.S.C. §1985(3). That statute provides that:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . , the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

The reach of § 1985(3) has been carefully defined by the courts. As the United States Court of Appeals for the Third Circuit has observed, "in Griffin v. Breckenridge, 403 U.S. 88(1971) . . . , the Supreme Court clarified that the reach of section 1985(3) is limited to private conspiracies predicated on 'racial, or perhaps

otherwise class based, invidiously discriminatory animus.' Id. at 102." Lake v.

Arnold, 112 F.3d 682, 685 (3d Cir. 1997).  Thus:

> Section 1985(3) permits an action to be brought by one injured by a
> conspiracy formed "for the purpose of depriving, either directly or
> indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws."  42 U.S.C.
> § 1985(3).  In a line of cases . . . , the Supreme Court has made clear what
> a plaintiff must allege to state a claim under § 1985(3):  "(1) a
> conspiracy; (2) for the purpose of depriving, either directly or indirectly,
> any person or class of persons of the equal protection of the laws, or of
> equal privileges and immunities under the laws; and (3) an act in
> furtherance of the conspiracy; (4) whereby a person is injured in his
> person or property or deprived of any right or privilege of a citizen of the
> United States." United Bhd. of Carpenters & Joiners v. Scott, 463 U.S.
> 825, 828-29,(1983) (citing *Griffin,* 403 U.S. at 102-03).

Farber v. City of Paterson, 440 F.3d 131, 134 (3d. Cir. 2006).  See Lake v. Arnold, 112

F.3d 682, 685 (3d Cir. 1997).  "[B]ecause § 1985(3) requires the 'intent to deprive of

*equal* protection, or *equal* privileges and immunities,' a claimant must allege 'some

racial, *or perhaps otherwise class-based,* invidiously discriminatory animus behind

the conspirators' action' in order to state a claim." Id. at 135 (citations omitted,

emphasis in original).  In practice, "[t]here are two distinct aspects to the 'class-based

invidiously discriminatory animus' which, . . ., will support a § 1985(3) claim-the first

is defined by form, and the second by function.  Thus, a plaintiff must allege both that

the conspiracy was motivated by discriminatory animus against an identifiable class

and that the discrimination against the identifiable class was invidious." Id.

Yet, while proof of class-based discrimination is the gravamen of a § 1985(3) claim, "[t]here are no precise parameters defining the boundaries of 'class' within the meaning of section 1985(3). 'The best that can be said of § 1985(3) jurisprudence thus far is that it has been marred by fits and starts, plagued by inconsistencies, and left in flux by the Supreme Court.' Trautz v. Weisman, 819 F.Supp. 282, 291 (S.D.N.Y.1993)." Lake v. Arnold, supra, 112 F.3d at 685. Thus, while "a class for purposes of section 1985(3) must be 'something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors,'"the courts have "strictly construed" what constitutes a class under this civil rights statute. Id. In sum, proof of: (1) a conspiracy; (2) motivated by class-based animus is the essence of a § 1985(3) claim.

Adopting this strict construction of §1985(3), courts have declined to extend the protections of §1985(3) to college athletes as a class. See Kelley v. Bd. of Trustees of Univ. of Illinois, 832 F. Supp. 237, 243 (C.D. Ill. 1993) aff'd sub nom. Kelley v. Bd. of Trustees, 35 F.3d 265 (7th Cir. 1994). Therefore, in the absence of further well-pleaded facts, a §1985(3) claim simply does not lie here.

Finally, with respect to Flood's Title IX claims, as a general rule such claims require allegations and proof of intentional, gender-based bias in college athletics. See Parker v. Franklin Cnty. Cmty. Sch. Corp., 667 F.3d 910, 920 (7th Cir. 2012). The

well-pleaded allegations in Flood's complaint simply do not state a claim for intentional gender based discrimination by the NCAA in the resolution of this disciplinary matter. Rather, at most, these allegations, which relate solely to a sanction imposed upon a men's athletic program following allegations of misconduct pertaining to that program, describe an episode of alleged disparate treatment disparate treatment of men's and women's programs, disparate treatment which can readily be explained by the fact that the alleged misconduct only affected a men's program. Further, it is difficult to conceive of how a claim of intentional gender-based discrimination could be fashioned in this case, where Penn State and the NCAA were both working to resolve a matter which only affected one male athletic program, the Penn State football program. In this setting, it is hard to understand what course the NCAA could have followed which would not result in an impact on that men's program which differed from the impact on women's athletics generally.[2] This disparate impact, which was a function of the fact that the sanctions were tailored to address the specific men's

---

[2]Indeed, in the instant case, where only one men's program was implicated in any misconduct, the only paths which would have allowed the NCAA avoid this appearance of a potentially disparate impact would have been either an impotent response, in which no sanctions were imposed against any program, or a wildly disproportionate response, which would require sanctions against all programs regardless of gender, or culpability. The NCAA's failure to choose either of these options, by itself, simply cannot equate to intentional gender-based discrimination which violates Title IX.

athletic program implicated in misconduct, standing alone does not establish a Title IX claim, and Flood has pleaded no facts which would support an inference that this settlement entailed an intentional act of gender-based discrimination.

### 4. Flood Has Not Sufficiently Pleaded Any Fraud Claims

Further, to the extent that Flood has asserted various claims of fraudulent misrepresentation or fraudulent concealment his complaint fails to properly allege such matters. With respect to such allegations Rule 9(b) of the Federal Rules of Civil Procedure controls, and provides that: "(b) Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P., Rule 9(b). "Pursuant to Rule 9(b), a plaintiff averring a claim in fraud must specify ' "the who, what, when, where, and how: the first paragraph of any newspaper story." ' Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir.1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990)). 'Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." ' In re Rockefeller Ctr. Props. Secs. Litig., 311 F.3d 198, 216 (3d Cir.2002) (quoting In re Nice Sys., Ltd. Secs. Litig., 135 F.Supp.2d 551, 577 (D.N.J.2001),

emphasis supplied)." <u>Animal Science Products, Inc. v. China Nat. Metals & Minerals Import & Export Corp.</u>, 596 F.Supp.2d 842, 878 (D.N.J. 2008).

In this case, Flood's fraud allegations are largely inscrutable, and amount to little more than the talismanic recital of the elements of a cause of action. This cursory style of pleading will not suffice under Rule 9 to state a claim upon which relief may be granted, and these claims should also be dismissed.

> **5.** **<u>Flood May Not Maintain Derivative Third Party State Tort Claims for Breach of Fiduciary Duty, Negligent or Intentional Infliction of Emotional Distress</u>**

Flood's complaint also endeavors to assert state tort claims on behalf of Penn State football players for both negligent and intentional infliction of emotional distress, as well as breach of a fiduciary duty, arising out of the settlement of this NCAA sanctions matter through a consent agreement. These state tort law claims also fail as a matter of law.

Turning first to Flood's claim of intentional infliction of emotional distress, with respect to claims for intentional infliction of emotional distress, "courts have been chary to allow recovery for a claim of intentional infliction of emotional distress. Only if conduct which is extreme or clearly outrageous is established will a claim be proven." <u>Hoy v. Angelone</u>, 720 A.2d 745, 753-54 (Pa. 1998). Indeed, the

Restatement (Second) of Torts instructs that "[i]t has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that this conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." Restatement (Second) of Torts § 46, comment d; Hoy, 720 A.2d at 754. In keeping with these restrictive standards, the Pennsylvania Supreme Court has provided examples of conduct found to state a claim for intentional infliction of emotional distress, and such examples demonstrate the extraordinary nature of the theory:

> Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have had presented only the most egregious conduct. See e.g., Papieves v. Lawrence, 437 Pa. 373, 263 A.2d 118 (1970)(defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents (recognizing but not adopting section 46)); Banyas v. Lower Bucks Hospital, 293 Pa.Super. 122, 437 A.2d 1236 (1981)(defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide); Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265 (3d. Cir.1979)(defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false).

Hoy, 720 A.2d at 754.

Thus, in order to sustain a claim of intentional infliction of emotional distress, Pennsylvania law requires that a plaintiff plead that "(1) the conduct was extreme and outrageous; (2) the conduct was intentional; (3) the conduct caused emotional distress; and (4) the distress was severe. <u>Silver v. Mendel</u>, 894 F.2d 598, 606 n. 16 (3d Cir.1990). Ultimately, in order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must show that a defendant's conduct exceeded the bounds of decency and is intolerable under prevailing societal norms. <u>Swisher v. Pitz</u>, 868 A.2d 1228, 1230 (Pa.Super.Ct.2005); <u>see also</u> <u>Cox v. Keystone Carbon Co.</u>, 861 F.2d 390 (3d Cir.1988)." <u>Kearney v. JPC Equestrian, Inc.</u>, No. 3:11-CV-01419, 2012 WL 1020276, at *7 (M.D. Pa. Jan. 4, 2012) <u>report and recommendation adopted</u>, No. 3:11-CV-01419, 2012 WL 1020266 (M.D. Pa. Mar. 26, 2012). Applying this exacting standard, courts generally agree that discipline or sanctions in an organizational setting simply do not constitute intolerable or outrageous conduct. <u>See</u> <u>Cox v. Keystone Carbon Co.</u>, 861 F.2d 390, 395 (3d Cir. 1988)("It is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary" to support a claim for intentional infliction of emotional distress); <u>Gupta v. Sears Roebuck & Co.</u>, C.A. No. 07–243, 2007 U.S. Dist. LEXIS 56740 (W.D.Pa. Aug. 3, 2007); <u>Lantz v. University Hospital</u>, Civ. A. No. 96–2671, 1996 U.S. Dist. LEXIS 11154 (E.D.Pa. July 20, 1996) (conduct not extreme and outrageous where discharge

may have been improperly motivated); <u>Frankel v. Warwick Hotel</u>, 881 F.Supp. 436, 438 (E.D.Pa.1995) (father threatening his employee-son with termination because son refused to divorce his wife not extreme and outrageous); <u>Glickstein v. Consol. Freightways</u>, 718 F.Supp. 438 (E.D.Pa.1989) (termination based on age did not rise to level of extreme and outrageous conduct for purposes of an intentional infliction of emotional distress claim).

Judged by these standards, it simply cannot be said that this conduct by the NCAA, which entailed reaching an agreement with a University on a sanctions matter, exceeded the bounds of decency and is intolerable under prevailing societal norms. Therefore, this claim fails.

Nor can Flood maintain a claim for negligent infliction of emotional distress. Under Pennsylvania law:

> the cause of action for negligent infliction of emotional distress is restricted to four factual scenarios: (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative.

<u>Toney v. Chester County Hosp.</u>, 961 A.2d 192, 197–98 (Pa. Super. Ct. 2008).

None of these scenarios are implicated here. The allegedly distressing conduct in this case was the execution of a consent agreement, an action which was unaccompanied by any actual or threatened physical impact or injury. Despite his affection for Penn State football, this conduct did not affect a close relative of Mr. Flood. Further, courts have flatly rejected the notion that the relationship between student-athletes, colleges, and the NCAA somehow rises to the level of a fiduciary relationship. See Knelman v. Middlebury Coll., 898 F. Supp. 2d 697, 702 (D. Vt. 2012) aff'd, 570 F. App'x 66 (2d Cir. 2014).[3] In short, while the NCAA oversees some aspects of intercollegiate athletics it is not a fiduciary for the thousands of student athletes who participate in those sports, and may not be held to the legal standards of a fiduciary relationship. Since Flood has not pleaded facts which under Pennsylvania law would bring this case within the narrow ambit of the tort of negligent infliction of emotional distress, this claim is also subject to dismissal.

In closing we do not doubt Mr. Flood's sincerity, or the passion of his commitment to Penn State football. However, sincerity is no substitute for standing, and passion does not toll the statute of limitations. Moreover, no amount of sincerity or passion can overcome the many legal obstacles confronting Flood as he pursues

---

[3]The fact that no fiduciary relationship exists between the NCAA, colleges and student athletes is also fatal to Flood's breach of duty claim. (Doc. 1, Count 4.)

these claims in federal court. Finding that Flood's passionate commitment to Penn State athletics is insufficient to create constitutional standing, and inadequate to overcome the many legal barriers to this lawsuit, it is recommended that Flood's complaint be dismissed with respect to the following defendants: the NCAA, Donald Remy and Mark Emmert.[4]

## III. <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the motion to dismiss the complaint filed by defendants NCAA, Remy, and Emmert, (Doc. 11.), be GRANTED. IT IS FURTHER RECOMMENDED that the plaintiff's motion for next friend standing, (Doc. 22.) be DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local

---

[4]We note that a separate group of defendants representing the Big Ten Conference also have a motion to dismiss pending before this court. (Doc. 10.) Flood has not yet responded to this motion. Therefore, we defer action on that motion pending receipt of Mr. Flood's response.

Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 26th day of August 2015.

***S/Martin C. Carlson***
Martin C. Carlson
United States Magistrate Judge