**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID FLOOD, ADMINISTRATOR** | : | **Civil No. 1:15-CV-890** |
| **EXECUTIVE DIRECTOR THE** | : | |
| **NITTANY LIGER COLLEGIATE** | : | |
| **ATHLETES' CORPS. & NATIONAL** | : | |
| **SCOUTING AEGIS LLC** | : | |
| | : | |
| | : | |
| **Plaintiff** | : | **(Judge Caldwell)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **NATIONAL COLLEGIATE ATHLETIC** | : | |
| **ASSOCIATION, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

### I.    Statement of Facts and of the Case

This *pro se* complaint comes before us for consideration of a motion to dismiss filed by the defendants, Jim Delany and the Big Ten Conference. (Doc.10.) The plaintiff has not responded to this motion, and the time for filing a response has passed. Therefore, we will treat this motion as ripe for resolution, and for the reasons set forth below, we recommend that the motion to dismiss be granted.

The pleadings reveal that Mr. Flood is a deeply committed fan of Penn State Football, whose commitment to the Nittany Lions has inspired him to found the

Nittany Liger, a business entity which specializes in scouting and recruiting exceptionally talented blue chip high school and junior college student-athletes to be considered for scholarships at Penn State. (Doc. 1.) Flood's commitment to Penn State football has also inspired him to bring this federal lawsuit against the NCAA, its general counsel and its President, the Big Ten Conference and its President. (Id.)

The gravamen of Flood's complaint relates to a July 2012 consent decree entered into by the University and the NCAA in the wake of the Jerry Sandusky child sexual abuse scandal, a consent decree which imposed a series of NCAA sanctions upon the Penn State football program. (Id.) Asserting standing on behalf of the Penn State athletes affected by this consent decree, Flood purports to bring this lawsuit in federal court alleging some 11 causes of action including criminal uttering of false documents, civil rights violations, Title IX discrimination, negligent and intentional infliction of emotional distress, fraud, "breach of duty", and "negotiating in bad faith." (Id.)

Because Flood paid the filing fee prescribed by law, this *pro se* complaint was not subject to threshold legal screening but was served upon the defendants. However, as a *pro se* litigant the plaintiff was advised by this Court at this outset of this lawsuit of his responsibilities in this litigation. Thus, on May 7, 2015, the district court entered its Standing Practice Order in this case, an order which informed the plaintiff

of his responsibility to reply to defense motions, and warned him in clear and precise terms of the consequences which would flow from a failure to comply with briefing schedules on motions, stating:

> If the party opposing the motion does not file his or her brief and any evidentiary material within the 14-day time frame, Local Rule 7.6 provides that he or she shall be deemed not to oppose the moving party's motion. The motion may, therefore, be granted if: (1) the court finds it meritorious; or (2) the opposing party fails to comply with Local Rule 7.6 despite being ordered to do so by the court.

(Doc. 2, p. 2.)

The Defendant Big Ten Conference and Jim Delany have now filed a motion to dismiss this complaint, arguing both that Flood lacks standing to bring these third party claims, and that many of Flood's individual claims fail on their merits. (Doc 10.) Flood has not responded in any fashion to this motion, and the time for filing a response has now passed. Therefore, the motion will be deemed ripe for resolution.

## II.   Discussion

### A.   Under The Rules of This Court This Motion to Dismiss Should Be Deemed Unopposed and Granted

At the outset, under the Local Rules of this Court the plaintiff should be deemed to concur in this motion since the plaintiff has failed to timely oppose the motion, or otherwise litigate this case. This procedural default completely frustrates and impedes efforts to resolve this matter in a timely and fair fashion, and under the rules of this

court warrants dismissal of the action, since Local Rule 7.6 of the Rules of this Court imposes an affirmative duty on the plaintiff to respond to motions and provides that

> Any party opposing any motion, other than a motion for summary judgment, shall file a brief in opposition within fourteen (14) days after service of the movant's brief, or, if a brief in support of the motion is not required under these rules, within seven (7) days after service of the motion. *Any party who fails to comply with this rule shall be deemed not to oppose such motion*. Nothing in this rule shall be construed to limit the authority of the court to grant any motion before expiration of the prescribed period for filing a brief in opposition. A brief in opposition to a motion for summary judgment and LR 56.1 responsive statement, together with any transcripts, affidavits or other relevant documentation, shall be filed within twenty-one (21) days after service of the movant's brief.

Local Rule 7.6 (emphasis added).

It is now well-settled that "Local Rule 7.6 can be applied to grant a motion to dismiss without analysis of the complaint's sufficiency 'if a party fails to comply with the [R]ule after a specific direction to comply from the court.' Stackhouse v. Mazurkiewicz, 951 F.2d 29, 30 (1991)." Williams v. Lebanon Farms Disposal, Inc., No. 09-1704, 2010 WL 3703808, *1 (M.D. Pa. Aug.26, 2010). In this case the plaintiff has not complied with the Local Rules, or this Court's orders, by filing a timely response to this motion. Therefore, these procedural defaults by the plaintiff compel the Court to consider:

> [A] basic truth: we must remain mindful of the fact that "the Federal Rules are meant to be applied in such a way as to promote justice. *See*

Fed.R.Civ.P. 1. Often that will mean that courts should strive to resolve cases on their merits whenever possible. However, justice also requires that the merits of a particular dispute be placed before the court in a timely fashion ...." <u>McCurdy v. American Bd. of Plastic Surgery</u>, 157 F.3d 191, 197 (3d Cir.1998).

<u>Lease v. Fishel</u>, 712 F. Supp. 2d 359, 371 (M.D.Pa. 2010).

With this basic truth in mind, we acknowledge a fundamental guiding tenet of our legal system. A failure on our part to enforce compliance with the rules, and impose the sanctions mandated by those rules when the rules are repeatedly breached, "would actually violate the dual mandate which guides this Court and motivates our system of justice: 'that courts should strive to resolve cases on their merits whenever possible [but that] justice also requires that the merits of a particular dispute be placed before the court in a timely fashion'." <u>Id.</u> Therefore, we are obliged to ensure that one party's refusal to comply with the rules does not lead to an unjustified prejudice to those parties who follow the rules.

These basic tenets of fairness apply here. In this case, the plaintiff has failed to comply with Local Rule 7.6 by filing a timely response to this motion to dismiss. These failures now compel us to apply the sanction called for under Rule 7.6 and deem the plaintiff to not oppose this dispositive motion.

## B.    Dismissal of this Case Is Also Warranted Under Rule 41

Beyond the requirements imposed by the Local Rules of this Court, Rule 41(b) of the Federal Rules of Civil Procedure authorizes a court to dismiss a civil action for failure to prosecute, stating that:  "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it."  Fed. R. Civ. P. 41(b).  Decisions regarding dismissal of actions for failure to prosecute rest in the sound discretion of the court, and will not be disturbed absent an abuse of that discretion.  Emerson v. Thiel College, 296 F.3d 184, 190 (3d Cir. 2002)(citations omitted).  That discretion, however, while broad is governed by certain factors, commonly referred to as Poulis factors.  As the United States Court of Appeals for the Third Circuit has noted:

> To determine whether the District Court abused its discretion [in dismissing a case for failure to prosecute], we evaluate its balancing of the following factors: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense. Poulis v. State Farm Fire and Cas. Co., 747 F.2d 863, 868 (3d Cir.1984).

Emerson, 296 F.3d at 190.

In exercising this discretion "there is no 'magic formula' that we apply to determine whether a District Court has abused its discretion in dismissing for failure to prosecute." Lopez v. Cousins, 435 F. App'x 113, 116 (3d Cir. 2011)(quoting Briscoe v. Klem, 538 F.3d 252 (3d Cir. 2008)). Therefore, "[i]n balancing the Poulis factors, [courts] do not [employ] a . . . 'mechanical calculation' to determine whether a District Court abused its discretion in dismissing a plaintiff's case. Mindek v. Rigatti, 964 F.2d 1369, 1373 (3d Cir.1992)." Briscoe v. Klaus, 538 F.3d at 263. Consistent with this view, it is well-settled that " 'no single Poulis factor is dispositive,' Ware, 322 F.3d at 222, [and it is] clear that 'not all of the Poulis factors need be satisfied in order to dismiss a complaint.' Mindek, 964 F.2d at 1373." Briscoe v. Klaus, 538 F.3d at 263. Moreover, recognizing the broad discretion conferred upon the district court in making judgments weighing these six factors, the court of appeals has frequently sustained such dismissal orders where there has been a pattern of dilatory conduct by a *pro se* litigant who is not amenable to any lesser sanction. See, e.g., Emerson v. Thiel College, supra; Tillio v. Mendelsohn, 256 F. App'x 509 (3d Cir. 2007); Reshard v. Lankenau Hospital, 256 F. App'x 506 (3d Cir. 2007); Azubuko v. Bell National Organization, 243 F. App'x 728 (3d Cir. 2007).

In this case, a dispassionate assessment of the Poulis factors weighs heavily in favor of dismissing this action. At the outset, a consideration of the first Poulis factor,

the extent of the party's personal responsibility, shows that the delays in this case are

attributable to the plaintiff, who has failed to abide by court orders, and has otherwise

neglected to litigate this case, or respond to this defense motion.

Similarly, the second <u>Poulis</u> factor– the prejudice to the adversary caused by the

failure to abide by court orders–also calls for dismissal of this action. Indeed, this

factor–the prejudice suffered by the party seeking sanctions–is entitled to great weight

and careful consideration. As the United States Court of Appeals for the Third Circuit

has observed:

> "Evidence of prejudice to an adversary would bear substantial weight in
> support of a dismissal or default judgment." <u>Adams v. Trustees of N.J.</u>
> <u>Brewery Employees' Pension Trust Fund</u>, 29 F.3d 863, 873-74 (3d
> Cir.1994) (internal quotation marks and citation omitted). Generally,
> prejudice includes "the irretrievable loss of evidence, the inevitable
> dimming of witnesses' memories, or the excessive and possibly
> irremediable burdens or costs imposed on the opposing party." <u>Id</u>. at 874
> (internal quotation marks and citations omitted). . . . However, prejudice
> is not limited to "irremediable" or "irreparable" harm. <u>Id.</u>; <u>see also</u> <u>Ware</u>
> <u>v. Rodale Press, Inc</u>., 322 F.3d 218, 222 (3d Cir.2003); <u>Curtis T. Bedwell</u>
> <u>& Sons, Inc. v. Int'l Fidelity Ins. Co.</u>, 843 F.2d 683, 693-94 (3d
> Cir.1988). It also includes "the burden imposed by impeding a party's
> ability to prepare effectively a full and complete trial strategy." <u>Ware</u>,
> 322 F.3d at 222.

<u>Briscoe  v. Klaus</u>, 538 F.3d at 259-60.

In this case the plaintiff's failure to litigate this claim or comply with court

orders now wholly frustrates and delays the resolution of this action. In such

instances, the defendant is plainly prejudiced by the plaintiff's continuing inaction and dismissal of the case clearly rests in the discretion of the trial judge. Tillio v. Mendelsohn, 256 F. App'x 509 (3d Cir. 2007) (failure to timely serve pleadings compels dismissal); Reshard v. Lankenau Hospital, 256 F. App'x 506 (3d Cir. 2007) (failure to comply with discovery compels dismissal); Azubuko v. Bell National Organization, 243 F. App'x 728 (3d Cir. 2007) (failure to file amended complaint prejudices defense and compels dismissal).

When one considers the third Poulis factor-the history of dilatoriness on the plaintiff's part–it becomes clear that dismissal of this action is now appropriate. In this regard, it is clear that "'[e]xtensive or repeated delay or delinquency constitutes a history of dilatoriness, such as consistent non-response . . . , or consistent tardiness in complying with court orders.' Adams, 29 F.3d at 874." Briscoe v. Klaus, 538 F.3d at 260-61 (some citations omitted). Here, the plaintiff has failed to respond to a defense motion, has failed to timely file pleadings, and has not complied with orders of the Court. Thus, the plaintiff's conduct has begun to display "[e]xtensive or repeated delay or delinquency [and conduct which] constitutes a history of dilatoriness, such as consistent non-response . . . , or consistent tardiness in complying with court orders." Adams, 29 F.3d at 874.

The fourth Poulis factor–whether the conduct of the party or the attorney was willful or in bad faith–also cuts against the plaintiff in this case. In this setting we must assess whether this conduct reflects mere inadvertence or willful conduct, in that it involved "strategic," "intentional or self-serving behavior," and not mere negligence. Adams v. Trs. of N.J. Brewery Emps.' Pension Trust Fund, 29 F.3d 863, 875 (3d Cir.1994). At this juncture, when the plaintiff has failed to comply with instructions of the Court directing the plaintiff to take specific actions in this case, and has violated the Local Rules, the Court is compelled to conclude that the plaintiff's actions are not accidental or inadvertent but instead reflect an intentional disregard for this case and the Court's instructions.

While Poulis also enjoins us to consider a fifth factor, the effectiveness of sanctions other than dismissal, cases construing Poulis agree that in a situation such as this case, where we are confronted by a *pro se* litigant who will not comply with the rules or court orders, lesser sanctions may not be an effective alternative. See, e.g., Briscoe v. Klaus, 538 F.3d 252, 262-63 (3d Cir. 2008); Emerson, 296 F.3d at 191. This case presents such a situation where the plaintiff's status as a *pro se* litigant severely limits the ability of the court to utilize other lesser sanctions to ensure that this litigation progresses in an orderly fashion. In any event, by entering our prior orders, and counseling the plaintiff on his obligations in this case, we have endeavored

to use lesser sanctions, but to no avail.  The plaintiff still declines to obey court orders, and otherwise ignores his responsibilities as a litigant.  Since lesser sanctions have been tried, and have failed, only the sanction of dismissal remains available to the Court.

Finally, under <u>Poulis</u> we are cautioned to consider one other factor, the meritoriousness of the plaintiff's claims.  In our view, however, consideration of this factor cannot save this particular plaintiff's claims, since the plaintiff is now wholly non-compliant with his obligations as a litigant.  The plaintiff cannot refuse to address the merits of his claims, and then assert the untested merits of these claims as grounds for denying a motion to sanction him.  Furthermore, it is well-settled that " 'no single <u>Poulis</u> factor is dispositive,' <u>Ware</u>, 322 F.3d at 222, [and it is] clear that 'not all of the <u>Poulis</u> factors need be satisfied in order to dismiss a complaint.' <u>Mindek</u>, 964 F.2d at 1373." <u>Briscoe v. Klaus</u>,  538 F.3d at 263.  Therefore, the untested merits of the non-compliant plaintiff's claims, standing alone, cannot prevent imposition of sanctions.

In any event, as discussed below, the plaintiff's claims clearly fail on their merits, yet another factor which favors dismissal of this action.  The legal flaws inherent in these claims are discussed separately below.

## C.    The Plaintiff's Claims Fail on Their Merits

Finally, it is evident that Flood's claims fail on their merits, yet another factor which favors dismissal of this action.  The defendants have moved to dismiss this complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure which provides that a complaint should be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years.  Beginning with the Supreme Court's opinion in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) continuing with our opinion in <u>Phillips</u> [<u>v. County of Allegheny</u>, 515 F.3d 224, 230 (3d Cir. 2008)] and culminating recently with the Supreme Court's decision in <u>Ashcroft v. Iqbal</u> –U.S.–, 129 S.Ct. 1937 (2009) pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most

favorable to the plaintiff. <u>Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.</u>, 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997). Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not alleged." <u>Associated Gen. Contractors of Cal. v. California State Council of Carpenters</u>, 459 U.S. 519, 526 (1983). As the Supreme Court held in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." <u>Id.</u> at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." <u>Id.</u>

In keeping with the principles of <u>Twombly</u>, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> at 678. Rather, in conducting a review of the adequacy of complaint, the Supreme Court has advised trial courts that they must:

[B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 679.

Thus, following Twombly and Iqbal a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

[A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the court of appeals has observed: "The Supreme Court in Twombly set forth the 'plausibility' standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege 'enough

facts to state a claim to relief that is plausible on its face.' Twombly, 550 U.S. at 570, 127 S.Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). This standard requires showing 'more than a sheer possibility that a defendant has acted unlawfully.' Id. A complaint which pleads facts 'merely consistent with' a defendant's liability, [ ] 'stops short of the line between possibility and plausibility of "entitlement of relief." ' " Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011) cert. denied, 132 S. Ct. 1861, 182 L. Ed. 2d 644 (U.S. 2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Iqbal, 129 S.Ct. at 1947. Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Id. at 1950. Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' Id." Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010). Applying these legal guideposts, for the reasons set

forth below, it is recommended that the Big Ten's to dismiss be granted, and Flood's motion for next friend standing be denied.

### 1. Flood Lacks Standing To Bring Third Party Claims On Behalf of Penn State Athletes

At the outset, it appears that Flood lacks standing to bring this action to the extent that he purports to sue the Big Ten on behalf of Penn State athletes. "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.' Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)." Kowalski v. Tesmer, 543 U.S. 125, 128 29, 125 S. Ct. 564, 567, 160 L. Ed. 2d 519 (2004). Standing is a essential prerequisite to filing an action in federal court. As we have explained:

> A party invoking federal jurisdiction must establish that he has standing to sue within the meaning of Article III, Section Two of the Constitution, which limits the courts to hearing actual cases or controversies." Anjelino v. New York Times, 200 F.3d 73, 88 (3d Cir.1999). "[T]he irreducible constitutional minimum" of standing requires a party to set forth specific facts indicating the existence of an actual or imminent injury that is causally connected to the defendant's challenged action and is " 'likely' " to be " 'redressed by a favorable decision.' " Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting Simon v. En. Ky. Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). "Courts assess whether a party has established injury-in-fact, causation, and redressability by considering whether the alleged injury falls within the 'zone of interests' that the statute or constitutional provision at issue was

designed to protect; whether the complaint raises concrete questions, rather than abstract ones that are better suited to resolution by the legislative and executive branches; and whether the plaintiff is asserting his own legal rights and interests, as opposed to those of third parties." Anjelino, 200 F.3d at 88.

Montone v. City of Jersey City, 709 F.3d 181, 196 (3d Cir. 2013).

In the instant case, Flood's complaint relies largely upon a particular form of standing, known as third party standing, since Flood–who is not a Penn State athlete–seeks to litigate claims on behalf of Penn State athletes. Such assertions of third party standing are strongly disfavored by the courts. As the Supreme Court has explained:

> We have adhered to the rule that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, supra, at 499, 95 S.Ct. 2197. This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation. See 422 U.S., at 500, 95 S.Ct. 2197. It represents a "healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed," Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 955, n. 5, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), the courts might be "called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights," Warth v. Seldin, supra, at 500, 95 S.Ct. 2197. We have not treated this rule as absolute, however, recognizing that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another. But we have limited this exception by requiring that a party seeking third-party standing make two additional showings. First, we

> have asked whether the party asserting the right has a "close" relationship with the person who possesses the right.  Powers v. Ohio, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).  Second, we have considered whether there is a "hindrance" to the possessor's ability to protect his own interests.  Ibid.

Kowalski v. Tesmer, 543 U.S. 125, 129-30, 125 S. Ct. 564, 567-68, 160 L. Ed. 2d 519 (2004).

Judged against these constitutional and prudential benchmarks for standing, we submit that Flood lacks standing to assert third party claims on behalf of Penn State athletes.  While we do not in any way denigrate or diminish the passion of Flood's commitment to Penn State football, in our view the passions of even the most passionate of sports fans do not qualify as the type of "close" relationship which supports third party standing.  See Mayer v. Belichick, 605 F.3d 223, 237 (3d Cir. 2010)(New York Jets fan suffered no legally cognizable injury from the New England Patriots' surreptitious videotaping of Jets' game signals).  Moreover, there is no indication that Penn States athletes suffer an hindrance which wholly prevents them from litigating claims on their own behalf.  Quite the contrary, Penn State athletes have brought legal claims in the wake of this consent decree, and historically Penn State students have displayed both a willingness and an ability to bring their own claims in federal court.  See Benner v. Oswald, 444 F. Supp. 545 (M.D. Pa. 1978) aff'd, 592 F.2d 174 (3d Cir. 1979).

-18-

Finally, Flood' status as a *pro se* litigant presents a further impediment to this assertion of third party standing since *pro se* parties are traditionally barred from asserting claims on behalf of others. For example, "a prisoner proceeding *pro se* may not seek relief on behalf of his fellow inmates. See Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir.1975) ("[I]t is plain error to permit [an] imprisoned litigant who is unassisted by counsel to represent his fellow inmates in a class action."); see also Wallace v. Smith, 145 Fed. Appx. 300, 302 (11th Cir.2005)." Alexander v. New Jersey State Parole Bd,. 160 F.App'x 249, 250 (3d Cir. 2005). Thus, "*pro se* litigants are generally not appropriate as class representatives. See Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir.1975)." Hagan v. Rogers, 570 F.3d 146, 159 (3d Cir. 2009).

In sum, Flood has failed to demonstrate a valid claim to third party standing in this case. Therefore, his motion for a declaration of next friend standing should be denied, and Flood's claims that are premised on third party standing should be dismissed.

## 2. The Remaining Counts of Flood's Complaint Fail to State Claims Upon Which Relief May Be Granted

Beyond this threshold constitutional and prudential obstacle to pursuing this lawsuit arising from Flood's inability to assert third party standing, the specific claims

advanced by Flood fail on numerous, independent legal grounds. The legal flaws in these separate claims are discussed separately below:

### a. Flood May Not Bring Criminal Claims in This Civil Lawsuit

At the outset, in his complaint Flood appears to rely upon what he describes as a federal criminal statute prohibiting uttering and publishing false instruments with the intent to defraud to bring a claim against the Big Ten and its officers. The short answer to this contention is that it is well established that decisions regarding the enforcement of criminal laws are the prerogative of the executive branch of government, are consigned to the sound discretion of prosecutors, and under the separation of powers doctrine are not subject to judicial fiat. Indeed, it has long been recognized that the exercise of prosecutorial discretion is a matter, "particularly ill-suited to judicial review." Wayte v. United States, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Recognizing this fact, courts have long held that plaintiffs may not seek relief against third parties in civil litigation through some exclusively criminal statute, finding that civil plaintiffs lack standing to make such claims and concluding that such relief simply is unavailable in a civil lawsuit. See, e.g., Ostrowski v. Mehltretter, 20 Fed. Appx. 87, 90 (2d Cir.2001) (stating that "Ostrowski has no standing to sue for any of Mehltretter's actions. First of all, he has not shown,

injury-in-fact. The failure of Mehltretter to investigate or prosecute Bybel did not injure him in any direct manner-he has no 'personal stake in the outcome' of a perjury case brought against (or not brought against) another person .”); See also Kim v. Romero, 877 F.2d 64, 1989 WL 67116 at *1 (9th Cir. June 14, 1989) (affirming the dismissal of a suit against various prosecuting authorities for their failure to bring charges against a sheriff for alleged battery); McMinn v. Damiani, 765 F.2d 145, 1985 WL 13323 (6th Cir. May 3, 1985) (affirming the dismissal for lack of standing a pro se civil rights case where plaintiff had sued state prosecuting authorities for failing to investigate or prosecute claims against various state judges and lawyers); Gessner v. Dep't of Corr., 3:14-CV-111, 2014 WL 972290 (M.D. Pa. Mar. 12, 2014); Snyder v. Aaron, CIV.A. 05–1602, 2006 WL 544466 (W.D.Pa. Mar.6, 2006); Mover v. Borough of North Wales, Civ. No. 00–1092, 2000 WL 1665132 at *2 (E.D.Pa.Nov.7, 2000) (stating that “Moyer has no judicially cognizable interest in Timothy Conley's criminal prosecution. Accordingly, an agreement to refrain from prosecuting Conley for sexual assault or to charge him with disorderly conduct or the act thereof violates no constitutional right that Moyer has standing to assert.”); see also Wise v. Augustine, Civ. No. 97–2651, 1997 WL 534695 at *2 (E.D.Pa. Aug.8, 1997) (stating that “[a] private citizen has no constitutional, statutory, or common law right to require a public official to investigate or prosecute a crime.”); Dundore v. O'Donnell, Civ. No.

85–2907, 1985 WL 2681 at *2 (E.D.Pa. Sept.17, 1985) (stating that "Defendant O'Donnell is alleged to have refused to file the criminal charges brought by plaintiffs. Although plaintiffs were no doubt aggrieved when O'Donnell refused to file the charges, they have no constitutional right that I am aware of to have criminal charges filed."); Corbin v. Stevens, Civ. No. 91–1054, 1992 WL 96684 at *2 (S.D.N.Y. April 30, 1992) (stating that "[p]laintiff possesses no constitutional right to have someone arrested...."). Therefore, this claim fails as a matter of law and should be dismissed.

### b.    Flood's Claims Are Time-Barred

In addition, many of Flood's claims are time-barred. Flood's lawsuit challenges a July 2012 consent decree entered into between Penn State University and the NCAA. Flood first brought this claim in May of 2015, almost three years later, alleging state law torts and civil rights violations under Title IX as well as 42 U.S.C. §§1983 and 1985(3). It is well-settled that claims brought pursuant to 42 U.S.C. §§ 1983 and 1985(3) are subject to the state statute of limitations for personal injury actions; Wilson v. Garcia, 471 U.S. 261, 266-67 (1985), which in Pennsylvania is a two year limitations period. Lake v. Arnold, 232 F.3d 360, 368-69 (3d Cir. 2000) (applying Pennsylvania's two-year personal injury statute of limitations to claims under 42 U.S.C. §§ 1983and 1985(3)). In Pennsylvania, the statute of limitations for tort actions, like the state law torts asserted here by Flood, is also generally two years, or

less.  42 Pa.C.S.A. § 5524.  See Aquilino v. Phila. Catholic Archdiocese, 2004 PA Super 339, ¶ 8, 884 A.2d 1269, 1275 (2005) (applying two-year limitations period set forth in 42 Pa. C.S. § 5524 to claims for intentional and negligent infliction of emotional distress); Maillie v. Greater Del. Valley Health Care, Inc., 156 Pa. Commw. 582, 590, 628 A.2d 528, 532 (1993) (stating that 42 Pa. C.S. § 5524(7) "provides a two-year statute of limitations for commencing proceedings based upon alleged fraud, which includes breach of a fiduciary duty"); see also 42 Pa. C.S. § 5523; Dellape v. Murray, 651 A.2d 638, 640 (Pa. Commw. Ct. 1994) ("The statute of limitations for a defamation cause of action is one year" (citing 42 Pa. C.S. § 5523)).  Further, a claim under Title IX is deemed to be subject to a two-year statute of limitations.  Bougher v. Univ. of Pittsburgh, 882 F.2d 74, 77-78 (3d Cir. 1989)(applying Pennsylvania's two-year personal injury statute of limitations to claims under Title IX).

A cause of action accrues for statute of limitations purposes when the plaintiff knows or has reason to know of the injury that constitutes the basis of the cause of action.  Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998); see also, Nelson v. County of Allegheny, 60 F.3d 1010 (3d Cir. 1995).  While this two-year limitations period may be extended based upon a continuing wrong theory, a plaintiff must make an exacting showing to avail himself of this grounds for tolling the statute of limitations.  For example, it is well settled that the

"continuing conduct of [a] defendant will not stop the ticking of the limitations clock [once] plaintiff obtained requisite information [to state a cause of action]. On discovering an injury and its cause, a claimant must choose to sue or forego that remedy." Barnes v. American Tobacco Co., 161 F.3d 127, 154 (3d Cir. 1998) (quoting Kichline v. Consolidated Rail Corp., 800 F. 2d 356, 360 (3d Cir. 1986)). See also Lake v. Arnold, 232 F.3d 360, 266-68 (3d Cir. 2000). Instead:

> The continuing violations doctrine is an "equitable exception to the timely filing requirement." West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir.1995). Thus, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1295 (3d Cir.1991).In order to benefit from the doctrine, a plaintiff must establish that the defendant's conduct is "more than the occurrence of isolated or sporadic acts." West, 45 F.3d at 755 (quotation omitted). Regarding this inquiry, we have recognized that courts should consider at least three factors: (1) subject matter-whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency-whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence-whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. See id. at 755 n. 9 (citing Berry v. Board of Supervisors of Louisiana State Univ., 715 F.2d 971, 981 (5th Cir.1983)). The consideration of "degree of permanence" is the most important of the factors. See Berry, 715 F.2d at 981.

Cowell v. Palmer Township. 263 F.3d 286, 292 (3d Cir. 2001).

Judged against these guideposts, Flood's claims–all of which were made approximately 33 months after the execution of this consent agreement–are barred by the statute of limitations. Nor can Flood save these otherwise time-barred claims by reference to some continuing violation theory. Given the gravity which Flood attaches to the execution of this agreement, it is evident that this event had, for Flood, a degree of permanence which should have placed Flood on immediate notice of the necessity for legal action on his part. Flood's failure to act over a 33 month period, therefore, cannot be excused and these claims fall beyond the statute of limitations.

        c.      <u>**Flood's Title IX, Section 1983 and Section 1985(3) Claims Also Fail as a Matter of Law**</u>

Likewise, Flood may not rely upon 42 U.S.C. §1983, the general federal civil rights statute, to bring a claim against the Big Ten and its officers, all of whom are non-governmental actors. It is well-established that § 1983 does not by its own force create new and independent legal rights to damages in civil rights actions. Rather, § 1983 simply serves as a vehicle for private parties to bring civil actions to vindicate violations of separate, and pre-existing, legal rights otherwise guaranteed under the Constitution and laws of the United States. <u>Albright v. Oliver</u>, 510 U.S. 266, 271 (1994); <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989). Therefore, any analysis of the legal sufficiency of a cause of action under § 1983 must begin with an assessment

of the validity of the underlying constitutional and statutory claims advanced by the plaintiff.

In this regard, it is also well-settled that:

> Section 1983 provides a remedy for deprivations of federally protected rights caused by persons acting under color of state law. The two essential elements of a § 1983 action are: *(1) whether the conduct complained of was committed by a person acting under color of state law*; and (2) whether this conduct deprived a person of a federally protected right. <u>Parratt v. Taylor</u>, 451 U.S. 527, 535 (1981).

<u>Boykin v. Bloomsburg University of Pennsylvania</u>, 893 F.Supp. 409, 416 (M.D.Pa. 1995), <u>aff'd</u>, 91 F3d 122 (3d Cir. 1996)(emphasis added). Thus, it is essential to any civil rights claim brought under § 1983 that the plaintiff allege and prove that the defendant was acting under color of law when that defendant allegedly violated the plaintiff's rights. To the extent that a complaint seeks to hold private parties liable for alleged civil rights violations, it fails to state a valid cause of action under 42 U.S.C. § 1983 since the statute typically requires a showing that the defendants are state actors. <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50 (1999).

This basic legal tenet is fatal to Flood's §1983 claims. Without diminishing in any way the significance of collegiate athletics to our popular culture, we are constrained to note that the United States Supreme Court has held that the NCAA is not a state actor for purposes of liability under §1983. <u>Nat'l Collegiate Athletic Ass'n</u>

v. Tarkanian, 488 U.S. 179, 199, 109 S. Ct. 454, 465, 102 L. Ed. 2d 469 (1988).

Therefore, NCAA disciplinary proceedings involving the Big Ten simply do not create

civil rights liability under this statute.

Nor can Flood maintain a claim under 42 U.S.C. §1985(3). That statute

provides that:

> If two or more persons in any State or Territory conspire or go in disguise
> on the highway or on the premises of another, for the purpose of
> depriving, either directly or indirectly, any person or class of persons of
> the equal protection of the laws, or of equal privileges and immunities
> under the laws; . . . , the party so injured or deprived may have an action
> for the recovery of damages occasioned by such injury or deprivation,
> against any one or more of the conspirators.

42 U.S.C. § 1985(3).

The reach of § 1985(3) has been carefully defined by the courts. As the United

States Court of Appeals for the Third Circuit has observed, "in Griffin v.

Breckenridge, 403 U.S. 88(1971) . . . , the Supreme Court clarified that the reach of

section 1985(3) is limited to private conspiracies predicated on 'racial, or perhaps

otherwise class based, invidiously discriminatory animus.' Id. at 102." Lake v.

Arnold, 112 F.3d 682, 685 (3d Cir. 1997). Thus:

> Section 1985(3) permits an action to be brought by one injured by a
> conspiracy formed "for the purpose of depriving, either directly or
> indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws." 42 U.S.C.

§ 1985(3). In a line of cases . . . , the Supreme Court has made clear what a plaintiff must allege to state a claim under § 1985(3): "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29,(1983) (citing Griffin, 403 U.S. at 102-03).

Farber v. City of Paterson, 440 F.3d 131, 134 (3d. Cir. 2006). See Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997). "[B]ecause § 1985(3) requires the 'intent to deprive of *equal* protection, or *equal* privileges and immunities,' a claimant must allege 'some racial, *or perhaps otherwise class-based,* invidiously discriminatory animus behind the conspirators' action' in order to state a claim." Id. at 135 (citations omitted, emphasis in original). In practice, "[t]here are two distinct aspects to the 'class-based invidiously discriminatory animus' which, . . ., will support a § 1985(3) claim-the first is defined by form, and the second by function. Thus, a plaintiff must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious." Id.

Yet, while proof of class-based discrimination is the gravamen of a § 1985(3) claim, "[t]here are no precise parameters defining the boundaries of 'class' within the meaning of section 1985(3). 'The best that can be said of § 1985(3) jurisprudence thus far is that it has been marred by fits and starts, plagued by inconsistencies, and left in

flux by the Supreme Court.' *Trautz v. Weisman*, 819 F.Supp. 282, 291 (S.D.N.Y.1993)." *Lake v. Arnold*, supra, 112 F.3d at 685. Thus, while "a class for purposes of section 1985(3) must be 'something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors,'" the courts have "strictly construed" what constitutes a class under this civil rights statute. *Id*. In sum, proof of: (1) a conspiracy; (2) motivated by class-based animus is the essence of a § 1985(3) claim.

Adopting this strict construction of §1985(3), courts have declined to extend the protections of §1985(3) to college athletes as a class. *See Kelley v. Bd. of Trustees of Univ. of Illinois*, 832 F. Supp. 237, 243 (C.D. Ill. 1993) *aff'd sub nom. Kelley v. Bd. of Trustees*, 35 F.3d 265 (7th Cir. 1994). Therefore, in the absence of further well-pleaded facts, a §1985(3) claim simply does not lie here.

Finally, with respect to Flood's Title IX claims, as a general rule such claims require allegations and proof of intentional, gender-based bias in college athletics. *See Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 920 (7th Cir. 2012). The well-pleaded allegations in Flood's complaint simply do not state a claim for intentional gender based discrimination by the NCAA in the resolution of this disciplinary matter. Rather, at most, these allegations, which relate solely to a sanction imposed upon a men's athletic program following allegations of misconduct pertaining

to that program, describe an episode of alleged disparate treatment disparate treatment of men's and women's programs, disparate treatment which can readily be explained by the fact that the alleged misconduct only affected a men's program. Further, it is difficult to conceive of how a claim of intentional gender-based discrimination could be fashioned in this case, where Penn State, the Big Ten and the NCAA were both working to resolve a matter which only affected one male athletic program, the Penn State football program. In this setting, it is hard to understand what course the Big Ten or NCAA could have followed which would not result in an impact on that men's program which differed from the impact on women's athletics generally.[1] This disparate impact, which was a function of the fact that the sanctions were tailored to address the specific men's athletic program implicated in misconduct, standing alone does not establish a Title IX claim, and Flood has pleaded no facts which would support an inference that this settlement entailed an intentional act of gender-based discrimination.

---

[1]Indeed, in the instant case, where only one men's program was implicated in any misconduct, the only paths which would have allowed the Big Ten and NCAA avoid this appearance of a potentially disparate impact would have been either an impotent response, in which no sanctions were imposed against any program, or a wildly disproportionate response, which would require sanctions against all programs regardless of gender, or culpability. The Big Ten and NCAA's failure to choose either of these options, by itself, simply cannot equate to intentional gender-based discrimination which violates Title IX.

### d. **Flood Has Not Sufficiently Pleaded Any Fraud Claims**

Further, to the extent that Flood has asserted various claims of fraudulent misrepresentation or fraudulent concealment his complaint fails to properly allege such matters. With respect to such allegations Rule 9(b) of the Federal Rules of Civil Procedure controls, and provides that: "(b) Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P., Rule 9(b). "Pursuant to Rule 9(b), a plaintiff averring a claim in fraud must specify ' "the who, what, when, where, and how: the first paragraph of any newspaper story."' Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir.1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990)). 'Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."' In re Rockefeller Ctr. Props. Secs. Litig., 311 F.3d 198, 216 (3d Cir.2002) (quoting In re Nice Sys., Ltd. Secs. Litig., 135 F.Supp.2d 551, 577 (D.N.J.2001), emphasis supplied)." Animal Science Products, Inc. v. China Nat. Metals & Minerals Import & Export Corp., 596 F.Supp.2d 842, 878 (D.N.J. 2008).

In this case, Flood's fraud allegations are largely inscrutable, and amount to little more than the talismanic recital of the elements of a cause of action. This cursory style of pleading will not suffice under Rule 9 to state a claim upon which relief may be granted, and these claims should also be dismissed.

> **e.** **Flood May Not Maintain Derivative Third Party State Tort Claims for Breach of Fiduciary Duty, Negligent or Intentional Infliction of Emotional Distress**

Flood's complaint also endeavors to assert state tort claims on behalf of Penn State football players for both negligent and intentional infliction of emotional distress, as well as breach of a fiduciary duty, arising out of the settlement of this NCAA sanctions matter through a consent agreement. These state tort law claims also fail as a matter of law.

Turning first to Flood's claim of intentional infliction of emotional distress, with respect to claims for intentional infliction of emotional distress, "courts have been chary to allow recovery for a claim of intentional infliction of emotional distress. Only if conduct which is extreme or clearly outrageous is established will a claim be proven." Hoy v. Angelone, 720 A.2d 745, 753-54 (Pa. 1998). Indeed, the Restatement (Second) of Torts instructs that "[i]t has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has

intended to inflict emotional distress, or even that this conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort."  Restatement (Second) of Torts § 46, comment d; <u>Hoy</u>, 720 A.2d at 754.  In keeping with these restrictive standards, the Pennsylvania Supreme Court has provided examples of conduct found to state a claim for intentional infliction of emotional distress, and such examples demonstrate the extraordinary nature of the theory:

> Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have had presented only the most egregious conduct.  <u>See e.g.</u>, <u>Papieves v. Lawrence</u>, 437 Pa. 373, 263 A.2d 118 (1970)(defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents (recognizing but not adopting section 46)); <u>Banyas v. Lower Bucks Hospital</u>, 293 Pa.Super. 122, 437 A.2d 1236 (1981)(defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide); <u>Chuy v. Philadelphia Eagles Football Club</u>, 595 F.2d 1265 (3d. Cir.1979)(defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false).

<u>Hoy</u>,720 A.2d at 754.

Thus, in order to sustain a claim of intentional infliction of emotional distress, Pennsylvania law requires that a plaintiff plead that "(1) the conduct was extreme and outrageous; (2) the conduct was intentional; (3) the conduct caused emotional distress;

and (4) the distress was severe.  Silver v. Mendel, 894 F.2d 598, 606 n. 16 (3d Cir.1990).  Ultimately, in order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must show that a defendant's conduct exceeded the bounds of decency and is intolerable under prevailing societal norms.  Swisher v. Pitz, 868 A.2d 1228, 1230 (Pa.Super.Ct.2005); see also Cox v. Keystone Carbon Co., 861 F.2d 390 (3d Cir.1988)."  Kearney v. JPC Equestrian, Inc., No. 3:11-CV-01419, 2012 WL 1020276, at *7 (M.D. Pa. Jan. 4, 2012) report and recommendation adopted, No. 3:11-CV-01419, 2012 WL 1020266 (M.D. Pa. Mar. 26, 2012).  Applying this exacting standard, courts generally agree that discipline or sanctions in an organizational setting simply do not constitute intolerable or outrageous conduct.  See Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988)("It is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary" to support a claim for intentional infliction of emotional distress); Gupta v. Sears Roebuck & Co., C.A. No. 07–243, 2007 U.S. Dist. LEXIS 56740 (W.D.Pa. Aug. 3, 2007); Lantz v. University Hospital, Civ. A. No. 96–2671, 1996 U.S. Dist. LEXIS 11154 (E.D.Pa. July 20, 1996) (conduct not extreme and outrageous where discharge may have been improperly motivated); Frankel v. Warwick Hotel, 881 F.Supp. 436, 438 (E.D.Pa.1995) (father threatening his employee-son with termination because son refused to divorce his wife not extreme and outrageous); Glickstein v. Consol.

<u>Freightways</u>, 718 F.Supp. 438 (E.D.Pa.1989) (termination based on age did not rise to level of extreme and outrageous conduct for purposes of an intentional infliction of emotional distress claim).

Judged by these standards, it simply cannot be said that this conduct by the Big Ten, which entailed reaching an agreement with a University on a sanctions matter, exceeded the bounds of decency and is intolerable under prevailing societal norms. Therefore, this claim fails.

Nor can Flood maintain a claim for negligent infliction of emotional distress. Under Pennsylvania law:

> the cause of action for negligent infliction of emotional distress is restricted to four factual scenarios: (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative.

<u>Toney v. Chester County Hosp.</u>, 961 A.2d 192, 197–98 (Pa. Super. Ct. 2008).

None of these scenarios are implicated here. The allegedly distressing conduct in this case was the execution of a consent agreement, an action which was unaccompanied by any actual or threatened physical impact or injury. Despite his affection for Penn State football, this conduct did not affect a close relative of Mr. Flood. Further, courts have flatly rejected the notion that the relationship between

student-athletes, colleges, the Big Ten and the NCAA somehow rises to the level of a fiduciary relationship.  See Knelman v. Middlebury Coll., 898 F. Supp. 2d 697, 702 (D. Vt. 2012) aff'd, 570 F. App'x 66 (2d Cir. 2014).[2]  In short, while the Big Ten  and the NCAA oversee some aspects of intercollegiate athletics it is not a fiduciary for the thousands of student athletes who participate in those sports, and may not be held to the legal standards of a fiduciary relationship.  Since Flood has not pleaded facts which under Pennsylvania law would bring this case within the narrow ambit of the tort of negligent infliction of emotional distress, this claim is also subject to dismissal.

In closing we do not doubt Mr. Flood's sincerity, or the passion of his commitment to Penn State football.  However, sincerity is no substitute for standing, and passion does not toll the statute of limitations.  Moreover, no amount of sincerity or passion can overcome the many legal obstacles confronting Flood as he pursues these claims in federal court.  Finding that Flood's passionate commitment to Penn State athletics is insufficient to create constitutional standing, and inadequate to overcome the many legal barriers to this lawsuit, it is recommended that Flood's complaint be dismissed with respect to the following defendants: the Big Ten Conference and Jim Delany.

---

[2]The fact that no fiduciary relationship exists between the Big Ten, the NCAA, colleges and student athletes is also fatal to Flood's breach of duty claim. (Doc. 1, Count 4.)

In sum, this merits analysis reveals that this motion to dismiss is on its face meritorious. Therefore, we find that all of the <u>Poulis</u> factors call for dismissal of this case. Having concluded that this *pro se* complaint is flawed in a profound way, we recognize that in civil rights cases *pro se* plaintiffs often should be afforded an opportunity to amend a complaint before the complaint is dismissed in its entirety, <u>see Fletcher-Hardee Corp. v. Pote Concrete Contractors</u>, 482 F.3d 247, 253 (3d Cir. 2007), unless it is clear that granting further leave to amend would be futile, or result in undue delay. <u>Alston v. Parker</u>, 363 F.3d 229, 235 (3d Cir. 2004). In this case, the current complaint fails to state a viable civil rights cause of action, the factual and legal grounds proffered in support of this complaint make it clear that the plaintiff has no right to relief, and the plaintiff has declined to respond to court orders, or otherwise litigate these claims. On these facts, we conclude that granting further leave to amend would be futile or result in undue delay. <u>Alston v. Parker</u>, 363 F.3d 229, 235 (3d Cir. 2004). Therefore, it is recommended that the complaint be dismissed without further leave to amend.

## III.  <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the motion to dismiss the complaint filed by defendants Jim Delany and the Big Ten Conference, (Doc. 10.), be GRANTED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 8th day of September 2015.

_**S/Martin C. Carlson**_
Martin C. Carlson

United States Magistrate Judge